## UNITED STATES v. CLARK et al.

### No. 13650.

District Court, W. D. Missouri, W. D.

Feb. 25, 1937.

Maurice M. Milligan, U. S. Atty., and Randall Wilson, Sam C. Blair, Thomas Costolow, and Richard Phelps, Asst. U. S. Attys., all of Kansas City, Mo.

I. J. Ringolsky, William Boatright, Harry Jacobs, Ludwick Graves, and James Daleo, all of Kansas City, Mo., for defendants.

OTIS, District Judge.

The verdict of guilty as to defendants Luteran, Adams, Loren E. Wells, Joe R. Wells, Jr., and Roach was returned by the jury on Monday, February 22, 1937.[1] After the verdict had been read by the clerk, I announced that sentences would be imposed on the convicted defendants (and also on defendants Sperry and Clark, who had entered pleas of nolo contendere) on Thursday, February 25th, at 9:30 a. m. On the morning of the last-mentioned day a motion for a new trial and in arrest of judgment was filed on behalf of the convicted defendants. Counsel for defendants announced that they did not desire to be heard orally in support of the motion for a new trial, and, after having been read and considered, it was overruled. At the time it was overruled I announced that a written memorandum touching the motion for new trial would be prepared, if time permitted, and filed.

I conceive it to be the duty of the trial judge, when a motion for a new trial is filed in a criminal case (or, for that matter, in any case), to prepare and file a memorandum of the reasons for his action on the motion. He owes that duty not only to the parties, but even more he owes it to the judges of the reviewing

[1] In explanation of the fact that the trial of this case was continued into Monday, February 22, 1937 (Washington's birthday), it should be said that that was made necessary by the desirability of avoiding increased expense, the jury being impounded, and by the desirability of preventing a piling up of cases; for trial. Continuing the trial on February 22d only could have been avoided by night sessions of court on the Friday and Saturday preceding. Counsel for the defendants asked the court to omit these night sessions and said to the court that no objection would be made by them to the fact that it would be necessary to continue with the trial on February 22d.

court or courts. Appellate judges sometimes are aided (at least their time is saved) by statements of reasons for rulings made in the court below.

Unfortunately this memorandum cannot be greatly helpful. If learned counsel for defendants had made an oral argument in support of the motion, they would have indicated the rulings which they specially regarded as erroneous and prejudicial. Those rulings then might have been discussed in the memorandum. In the absence of an oral argument (and no criticism is intended for the failure of counsel to argue the motion orally), it is, of course, impossible to know which of the 106 grounds set up in the motion really are relied on. It is impracticable to discuss each one of such a multitude of claimed errors.

About all that can be done is to classify the grounds set out in the motion under appropriate headings and to discuss briefly each of the general subjects embraced in the points made in the motion. The motion attacks (1) rulings made before the trial began; (2) the overruling of motions for instructed verdicts; (3) rulings on the admission and exclusion of testimony; (4) the charge to the jury.

Points 1 and 2 of the motion concern the overruling of the plea in abatement (which was bottomed on the nature of the charge of Judge Reeves to the grand jury) and the overruling of the motion to quash the indictment. Most of what I might say about these matters I have said in the opinion touching them filed in this case. To that a sentence may be added now. Now that we know from the disclosure of testimony in this case something of what the grand jury actually had before it on which to bottom its indictment, we more fully can realize what a miscarriage of justice it would have been to abate the indictment on the theory that possibly it was the result, not of evidence before the grand jury, but of prejudice and passion stirred up by the charge to the grand jury.

■ Point 3 of the motion refers to the refusal of the court to require the United States attorney to inform and advise the defendants in this case as to the order in which, out of three companion cases, it would be tried. The point has no merit. Far more was done for these defendants than ever it has been the practice in this court to do for a defendant in a criminal case. These defendants were advised that out of all the many cases on the criminal calendar (approximately 40 cases) their case would be one of the first three to be tried, the two others being companion cases in which the attorneys for the defendants were the same as the attorneys in this case. To require the United States attorney, who must prepare a multitude of cases for trial, to inform each defendant as to the exact place at which his case will be tried, would be to paralyze the administration of the criminal law. The defendants in this case received not less, but more, than they were entitled to have in this regard.

■ Point 4 refers to the overruling of the motion to quash the petit jury panel. That motion was presented to the court after the case was called for trial on Thursday, February 18th. It was overruled. There was no time to prepare and file a memorandum setting out the reasons for the overruling of the motion. The principal complaint in the motion is that the panel of petit jurors was drawn from the whole of the Western District of Missouri, excluding Jackson county (Kansas City is in Jackson county).

The order directing that the panel of jurors be called from the entire district, excluding Jackson county, sets out the reasons for the order. At least it sets out some of the reasons. If that order is incorporated in the record in this case, the reviewing court will have opportunity to read what is there embodied. The order, however, does not tell the whole story.

The scarcely disputed testimony in this record throws a light on the Kansas City situation which the judges of the District Court, of course, saw clearly. Matters at last may become so notorious as that they are a part of common knowledge in the locality in which they have existence. It is not necessary, however, here to refer especially to these matters of common knowledge. The testimony in this case will disclose such a picture to the judges of the appellate court as sufficiently will reveal a more general condition than the precise spot depicted. This testimony reveals the deliberate alteration in one precinct in Kansas City of the ballots of more than 100 citizens. This testimony reveals the deliberate stuffing of a ballot box. The testimony reveals the domination in this precinct of judges and clerks of election by one of the defendants. It reveals such a display of terrorism on

election day, on registration day, on other days, as only one who wishes to be a superficial observer would think could be confined to a single precinct. The judges of the Court of Appeals, looking at the whole situation as it is disclosed by this segment of it, will know what the judges of the District Court knew from the beginning, that such sinister forces are at work in Kansas City as that to call jurors from Kansas City would be to invite mistrials and the breaking down of the administration of the law. Jurors as well as election judges, however, honest and well disposed by nature, easily may be robbed of their independence and their impartiality by threats, covert and open, so easily conveyed and conveyed in so many ways to those called for jury service. It was sought to avoid as much as possible this threatening evil by calling those who, because of their residence outside of Kansas City, might be less subject to injury and the fear of injury.

 Points 5 to 14, inclusive, of the motion are to the effect that the court should have directed verdicts of not guilty. The contention embodied in each of these points cannot well be discussed without such a review of all of the testimony as it is impracticable to set out in this memorandum. Of course, the fact that the defendants put on testimony after the motions for directed verdicts submitted at the close of the government's case were overruled constituted an abandonment of any complaint on that ground. The absence of merit in the motions for directed verdicts submitted at the close of the whole case undoubtedly will appear if the situation disclosed by all of the evidence is viewed as a whole, as it ought to be, and not in single bits disassociated from each other.

The evidence as a whole discloses beyond any possible controversy that at least 100 ballots cast by citizens who were qualified voters in the precinct deliberately were changed on election day so that, whereas the voters intended to vote straight Republican tickets, their ballots appeared to be (to one who shut his eyes to obvious erasures) straight Democratic tickets. The fraudulent intention of these forgeries clearly appeared from concurrent frauds demonstrated beyond controversy, especially the deliberate stuffing of the ballot box with ballots that never were cast and, at an earlier time on election

day, by the deliberate seizure and removal of the ballots by one of the defendants. What took place as shown by the evidence so conclusively demonstrated fraud that counsel for the defendants in their arguments to the jury frankly admitted it, made no apology for it, put the responsibility on one of the defendants, and sought to avoid the conclusion of conspiracy by suggesting that all other defendants either were ignorant of what this one defendant did, or were victims of his terrorism. I had this complete picture in my mind when I overruled the motions for directed verdicts. It seemed to me that to sustain the motion of any of the defendants I must be guilty of a stupidity equal to that which the defendant Luteran expected of his co-defendants when he enjoined them to say that they "heard nothing, saw nothing, and did nothing."

Points 16 to 68, inclusive, of the motion concern rulings made in connection with the admission and exclusion of testimony. I shall not undertake to discuss separately these more than 50 contentions of defendants. When there was any reason for argument concerning the admissibility of evidence, I orally stated at the time of the ruling the reason for the ruling made. Now I can only refer to what was then said in connection with the rulings.

Moreover, while I know of no ruling on the admission or exclusion of testimony which I now would change, it is impossible that it seriously can be argued that any one of them, even if erroneous, materially contributed to the final result. The few ultimate facts which the government sought to establish were indisputably established by unquestionably competent evidence.

Point 15 in the motion and points 69 to 97, inclusive, concern the charge to the jury. The charge speaks for itself and I shall not discuss it. He who reads the charge will note that almost every one of the great number of requested instructions which the defendants asked was given either exactly as asked or in substance. The exceptions taken go to none of the essential declarations of law contained in the charge, but rather to the illustrations by which it was sought to make clear the principles of law stated and to the review of the testimony. It will be noted, however, by him who reads the charge, that the jury very clearly and repeatedly was

advised that what was said touching the facts was not binding on the jury. It will be noted that very carefully I abstained from any statement of conclusion as to any issue of fact (unless it was obviously beyond controversy) and from any conclusion as to the guilt of any of the defendants.

Points 100 to 106, inclusive, are merely the usual summing up grounds set out in every motion for a new trial and require no separate discussion.